KDE:MEG
F.#2019R00706

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE ASSIGNED CALL NUMBER 347-528-9936 IN A RED AND WHITE CASE THAT IS STORED IN A BAG BEARING FBI CASE NUMBER 281D-NY-2169145 | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 19 MJ 587 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Steven Schiliro, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device described in Attachment A (the "SUBJECT DEVICE")—which is currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2009. From 2010 until 2015, I was assigned to the Joint Terrorism Task Force, where I was responsible for investigating acts of terrorism. I am currently assigned to New York Metro Safe Streets Task Force that investigates violent street gangs. I have experience with, among other things, executing search warrants, debriefing confidential

informants, conducting surveillance in an undercover and overt capacity, conducting toll analysis, and reviewing and analyzing data obtained from various media.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is an Apple iPhone with assigned call number 347-528-9936 in a red and white case that is stored in a bag bearing FBI case number 281D-NY-2169145, hereinafter the "Device." The Device was seized from Jahmeek Hudson, also known as "Jah" ("HUDSON") pursuant to his arrest on May 9, 2019 and has remained in the custody of the FBI since that date. The Device is currently located in the Eastern District of New York.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. Upon information and belief, there is probable cause to believe that the SUBJECT DEVICE contains evidence, fruits and/or instrumentalities of violations of 18 U.S.C. §§ 1512(k) (conspiracy to tamper with a witness) and 1512(b)(1) and (b)(2)(A) (tampering with a witness) (collectively, the "SUBJECT OFFENSES"). More specifically, as set forth below, there is probable cause to believe that HUDSON used the SUBJECT

2

DEVICE to attempt to intimidate and tamper with a person whom he believed would provide testimony in a federal criminal prosecution.

7. On July 5, 2018, a grand jury in the Eastern District of New York indicted Shakeem Boykins ("Boykins") on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g), in connection with the October 5, 2017 non-fatal shooting of Jane Doe by Boykins in the Louis H. Pink Houses, a New York City Housing Authority Complex in East New York, Brooklyn (the "Pink Houses"). Jane Doe is therefore a victim of Boykins' offense and potential witness against Boykins. At the time of HUDSON's criminal conduct, the criminal case against Boykins was pending, and a trial in the United States District Court for the Eastern District of New York was scheduled to commence in less than a month.[1]

8. On or about April 13, 2019, Jane Doe contacted law enforcement officers to report that photocopies of a report of a 2011 New York City Police Department ("NYPD") interview of Jane Doe had been posted in the lobbies of numerous buildings of the Pink Houses. The photocopies of the Jane Doe interview report (hereinafter, the "Posters") did not pertain to the case against Boykins but, as described below, contained a threatening message against Jane Doe apparently related to the Boykins trial.

---

[1] On June 14, 2019, Boykins was convicted by a jury at trial of the sole count of the indictment filed against him, which charged him with being a felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Section 922(g)(1). See United States v. Shakeem Boykins, 18-CR-338 (ERK).

3

9. Law enforcement officers subsequently obtained copies of the Posters described by Jane Doe from a lobby of a Pink Houses residential building. The Poster had handwriting on it that read, "[Jane Doe] Been a Rat And She Still Ratting." I am aware, based on my training and experience, that "ratting" is a commonly used derogatory slang word for cooperating with police. I am also aware that publicly identifying someone as assisting law enforcement exposes such a person to a significant risk of physical or other harm.

10. On or about April 15, 2019, Jane Doe provided to law enforcement officers a recording and text messages received on Jane Doe's telephone on or about April 12, 2019 and April 13, 2019. Based on information from Jane Doe's phone and Jane Doe's statements to law enforcement, I am aware that on or about April 12, 2019, at approximately 11:00 p.m., Jane Doe received a text message from the Facebook messenger account "Jah Banga," the Facebook account associated with HUDSON. Among other things, photographs on the "Jah Banga" Facebook account appear to depict HUDSON, based on my comparison of his likeness to known law enforcement photographs of HUDSON. Jane Doe also identified the "Jah Banga" Facebook account as belonging to HUDSON, a person whom Jane Doe knows as "Jah" and has known for a number of years from in and around the Pink Houses.

11. In the Facebook messenger conversation between Jane Doe and "Jah Banga," Jane Doe requested a telephone number in order to speak with the person messaging her about why he had attempted to contact Jane Doe. The person sent Jane Doe a telephone number. A family member of Jane Doe's ("Jane Doe's Family Member") called the telephone number and spoke to a male individual known to Jane Doe as "Gudda" ("Gudda")

while Jane Doe listened to the call. Based on information from Jane Doe, Gudda believed that he was speaking with Jane Doe's husband and stated, in sum and substance, that he had all the information he needed to know.

12. Following the telephone call between Gudda and Jane Doe's Family Member, at approximately 11:53 p.m., Jane Doe received a text message from a different telephone number—now known to the be the telephone number for the SUBJECT DEVICE—in which the author identified himself as "Jah" [i.e., HUDSON]. The text message read:

> Yo this y niggas was reaching out to ya bitch nigga she a rat and the little dog jammed up cuz of this bitch we just want you'll to keep street tell that bitch don't testify on the lil bro and this jah not Gudda the lil bro reach out to me and that was my only way of getting in touch so I no u a real nigga so make ya wife keep it real nigga.

The text message included a video recording. On the video recording, a voice can be heard to say: "Goin over all these rats out here. [Jane Doe], this 2011, she's been rattin." The video appears to display one of the Posters and the speaker states, in part, "She rattin on little homie now."

13. Based on my training and experience and participation in this investigation, I believe that the reference to "ya bitch" was used because the sender believed that he was communicating with Jane Doe's husband. Further, the text message references the prior call Jane Doe's Family Member had with Gudda ("Yo this y niggas was reaching out to ya bitch"). I further believe that the reference to "she a rat" is a reference to Jane Doe. I also believe that "to keep street" means to avoid cooperating with law enforcement. Further, the use of "lil bro" in the message and in the recording sent to Jane Doe's phone was a reference

5

to Boykins, who is younger than HUDSON. Based on the content of the messages, language of the poster, and my training and experience, I believe that HUDSON was attempting to prevent Jane Doe from testifying against Boykins, including by saying: "tell that bitch don't testify on the lil bro." In addition, I am informed by Jane Doe that she felt threatened by the messages and the Posters.

14. Law enforcement officers obtained email and telephone calls of Boykins from the Metropolitan Detention Center ("MDC"). Prior to the events recounted above, on or about April 9, 2019, Boykins sent an email that read, in part: "[S]ee if u get jah number for me I need to talk to him about something . . . ." The reference to "jah number" appears to be a reference to HUDSON's telephone number. Three hours later, the recipient of the email described above wrote to Boykins: "This jah # [the call number for the SUBJECT DEVICE]." The telephone number provided to Boykins was the same number used by HUDSON to contact Jane Doe.

15. Based on records obtained from Sprint Corporation ("Sprint"), the subscriber for the SUBJECT DEVICE is "Jah Jah." Call data records show three telephone calls between the SUBJECT DEVICE and Jane Doe's telephone number near and just after midnight on April 13, 2019.

16. Law enforcement officers obtained video surveillance footage from numerous Pink Houses buildings for April 13, 2019. Upon reviewing the footage, agents observed an individual wearing an orange cap posting most of the Posters of Jane Doe's interview report with the language about Jane Doe being a "Rat" in the lobbies of the Pink Houses. The individual's appearance was consistent with the appearance of HUDSON, based on my

6

review of publicly available social media profile photographs of HUDSON and law enforcement records.

17. On or about May 10, 2019, the Honorable Peggy Kuo, United States Magistrate Judge issued a search warrant for the "Jah Banga" Facebook account described above (Docket No. 19-MJ-437). Based on information obtained from Facebook, on or about April 15, 2019, two days after the calls to Jane Doe, a message was sent from HUDSON's Facebook account to an account for "Crissy Love" that read: "shit just sending my love till the bro I took care of everything on my part, the rest is on him and god." I believe the reference to "till" is actually to "tell" and that HUDSON was saying that "Crissy Love" should tell Boykins he had taken care of contacting Jane Doe. Based on other messages and records from the MDC, "Crissy Love" appears to be an account for Cristal Butler, a girlfriend of Boykins.

18. On May 9, 2019, HUDSON was arrested on a complaint charging him with witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1). At the time of his arrest, HUDSON was in possession of the SUBJECT DEVICE. In order to determine whether the device in HUDSON's possession was the device that was used to communicate with Jane Doe, I dialed the telephone number from which the messages that Jane Doe received were sent and the device that was in HUDSON's possession rang. Accordingly, I believe that the SUBJECT DEVICE was used to commit the SUBJECT OFFENSES.

19. The Device is currently in the lawful possession of the FBI. It was seized incident to HUDSON's lawful arrest. Accordingly, I seek this warrant to be certain that an

examination of the Device will comply with the Fourth Amendment and other applicable laws.

20. The Device is currently stored in my possession and is maintained in a bag bearing case number 281D-NY-2169145. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## **TECHNICAL TERMS**

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video;

8

storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the

ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable

storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to

13

draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not

involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Steven Schiliro
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on June 25, 2019.

_____  S/Bloom
THE HONORAB
UNITED STATE

15

# ATTACHMENT A

The property to be searched is an Apple iPhone assigned call number 347-528-9936 in a red and white case that is stored in a bag bearing FBI case number 281D-NY-2169145, hereinafter the "Device." The Device was seized from Jahmeek Hudson, also known as "Jah" ("HUDSON") pursuant to his arrest on May 9, 2019 and has remained in the custody of the FBI since that date. The Device is currently located in the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A) and 1512(k) and involve Jahmeek Hudson, Shakeem Boykins, Gudda and Crystal Butler since July 2018, including:

   a. Communications between HUDSON and other co-conspirators related to Shakeem Boykins' pending criminal matter, Jane Doe or other individuals HUDSON believed to be associate with Jane Doe;

   b. Communications between HUDSON and Jane Doe or other individuals HUDSON believed to be associated with Jane Doe;

   c. Photographs, including those of Jane Doe and those demonstrating an association between HUDSON and Shakeem Boykins or other co-conspirators;

   d. Evidence of HUDSON's creation and/or distribution of posters identifying Jane Doe as a "rat"; and

   e. Financial records demonstrating that HUDSON paid to obtain court-related documents related to Jane Doe.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history. As used above, the terms "records" and "information" include all of the foregoing items of evidence

in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.